## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**

**CRIMINAL NO. 11-10195-RWZ**

> **v.**

**NICOLAS ANTHIS,**

> **Defendant.**

## UNITED STATES' OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The United States respectfully submits that defendant NICOLAS ANTHIS's motion to suppress evidence should be denied. On both occasions, on January 17, 2010, in New York City, and on October 22, 2010, in Ontario, California, ANTHIS knowingly, intelligently, and voluntarily gave law enforcement agents consent to search. Even without consent, based on the totality of the circumstances, there was probable cause to search. What is more, with regards to the January 17, 2010, seizure in New York City, since ANTHIS was only a passenger in a rental vehicle, ANTHIS has not demonstrated a reasonable expectation of privacy in the vehicle that was searched. Finally, the post-arrest statements that ANTHIS made to law enforcement were voluntary and were made after agents advised ANTHIS of his Miranda warnings.

## I.  FACTUAL SUMMARY

### A.    Background of Case

The investigation that led to the indictment in this case began in June 2010, when

federal agents from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), along with officers from the Watertown Police Department, seized $70,040 in cash from the main target of the investigation, SAFWAN MADARATI.  By August 2010, agents assigned to a federal task force from ICE as well as the U.S. Drug Enforcement Administration ("DEA") and the Massachusetts State Police ("MSP") began a series of Title III wiretaps on MADARATI's cellular phones that continued until April 2011.  The wiretaps revealed that MADARATI was obtaining large quantities of marijuana from an organization based in Montreal, Canada.  One of the individuals responsible for laundering the drug money for the Montreal based organization was defendant NICHOLAS ANTHIS.  The evidence that implicates ANTHIS in a conspiracy to launder drug money includes four seizures of large sums of cash.  Two of the seizures took place in Massachusetts.  The other two took place in New York City and Ontario, California located in Southern California.

During the SAFWAN MADARATI wiretap investigation, in October 2010, law enforcement agents seized more than $2.7 million in U.S. currency in Massachusetts .  The first seizure took place on October 5, 2010.  That day, fugitive defendants NICHOLAS SOTIRIOU and DOMENICO GUZZI arrived in Boston from Canada and were observed driving to the cities of Revere and Easton and taking possession of heavily weighted bags from suspected marijuana traffickers.  The MSP conducted a traffic stop and found SOTIRIOU and GUZZI in the possession of $1,041,990 in U.S. currency.  After finding the money, SOTIRIOU claimed that he picked up the money on behalf of a

gold purchasing company in Canada named *Ghanadian Trading*.  SOTIRIOU stated that

he picked up the money from a building in Boston, even though during surveillance

agents never saw GUZZI or SOTIRIOU go by or enter any building in Boston.

On October 20, 2010, two males from Canada, defendants ELIAS KAPERONIS

and NICHOLAS ANTHIS, traveled to Massachusetts from Canada and claimed to federal

agents that they were owners of the money seized.  The interview was a consensual

interview and took place at the offices of a local attorney.  During the interview,

KAPERONIS and ANTHIS claimed to be partners in a cash for gold business called

*Ghanadian Trading* and told agents that the money that was seized was given to them by

"investors" and claimed that the money was going to be used to purchase gold at pawn

shops in the United States.  ANTHIS told agents GUZZI was an employee of *Ghanadian*

*Trading* and that GUZZI had picked the money that was seized from the offices of

*Ghanadian Trading* in New York City.

As further described below, at the time of this consensual interview in

Massachusetts, ANTHIS was well known to law enforcement.  Earlier that same year on

January 17, 2010, law enforcement agents seized a total of $1,271,394 in U.S. currency

from NICOLAS ANTHIS and a second Canadian male, Eleftherios Sardis, in New York

City.  Two days later after the interview in Massachusetts, on October 22, 2010, members

of the DEA seized $497,955 from ANTHIS in Ontario, California.  ANTHIS again

claimed the money was given to him by gold investors.  Five days later, on October 27,

2010, law enforcement agents seized $1,766,900 in U.S. currency from two Canadian

males, defendants GARABET JARTDIAN and BENJAMIN JARTIDIAN, as they were preparing to board a privately chartered jet at Hansom Airport in Bedford, Massachusetts. After finding the money, GARABET JARTIDIAN informed the MSP that the money belonged to ELIAS KAPERONIS and NICHOLAS ANTHIS of *Ghanadian Trading*. Records obtained from the privately charted jet revealed that ANTHIS, SOTIRIOU, and "Terry" Sardis were listed on the flight manifest for multiple privately chartered flights between from the New York and Boston area to Las Vegas, Nevada.  The investigation further revealed that this money was the proceeds of marijuana trafficking in the Northeast that was being transferred to California for the purchase cocaine for the organization in Montreal.

**B.      January 17, 2010 Seizure of  $1,271,394 from NICOLAS ANTHIS and Eleftherios Sardis in New York City**

Beginning by at least December 2009, law enforcement agents from ICE, DEA, and the New York City Police Department ("NYPD") began receiving information from a confidential source of information (the "CS") about the drug trafficking activities of an Albanian male in New York City identified as Gjavit Thaqi, a.k.a. "Doc."  This investigation led to the arrest and indictment of Thaqi and multiple others in July 2011, that is now pending in federal court in the Eastern District of New York in criminal case, *United States v. Thaqi et al*, 11-cr-00486-DLI.   It was the New York investigation into Thaqi that led to the January 17, 2010 seizure of  $1,271,394 from ANTHIS and Sardis in New York City.

According to the CS, Thaqi was receiving large quantities of hydroponic marijuana in New York from an organization in Canada.  In December 2009, the CS told agents that Thaqi had recently delivered $90,000 in drug proceeds to some individuals in Canada at a check cashing establishment in New York.  The CS also informed agents that after the New Year, Thaqi was expecting a shipment of 150 pounds of hydroponic marijuana, and that the marijuana was going be stored at a warehouse in Brooklyn.   Based on the information that the CS provided, on December 9, 2009, agents seized approximately 290 pounds of marijuana from this Brooklyn warehouse location.  On Sunday, January 17, 2010, the CS informed ICE Special Agent ("SA") Chris Poplow that Thaqi was arranging to deliver $250,000 to the Canadian organization on the same day as payment for a shipment of marijuana that Thaqi had received from the organization in Canada.

Following the receipt of this information, on January 17, 2010, at approximately 4:15 p.m., law enforcement agents from ICE, DEA, and New York State Police Special Investigations Unit ("SIU") set up surveillance in the 1900 bock of Bronxdale, Avenue in the Bronx, New York, near Thaqi's residence.  Hours later, at approximately 8:20 p.m., New York State Police ("NYSP") Investigator David Williams observed a 2006 Black Lincoln Navigator, bearing NY License Plate number ETM3164, parked at a nearby Getty gas station on the corner of Bronxdale Avenue and Neill Avenue. The vehicle was unoccupied, but was registered to one of the targets of the New York investigation, Robert Karaqi.  At approximately 9:18 p.m., NYSP Senior Investigator Ernesto Pizarro and ICE SA Christopher Popolow observed a 2001 Dark Gray Cadillac Deville parked on

the corner of Bronxdale Avenue and Matthews Avenue, about half way between the Getty Gas Station and Thaqi's residence.  Agent Popolow drove by the Cadillac and observed that another one of the targets of the investigation, Nicholas Masi, was operating the vehicle.  At approximately 9:23 p.m., Investigator Theodore Epidy, DEA SA Kenneth Wasley, and Special Agent A Popolow observed Masi pull into the Getty gas station at Bronxdale Avenue and Neill Avenue and park parallel to the Lincoln Navigator.  These agents then observed Masi open the trunk of the Cadillac and observed two males, later identified as Thaqi and Karaqi, open the back of the Lincoln Navigator.  The males were then observed conversing for a couple of minutes.

At approximately 9:24 p.m., Investigator Epidy observed Masi take a red duffel bag from the Cadillac and transfer it to the back of the Lincoln Navigator.  About a minute later at 9:25 p.m., Investigator Epidy observed Masi leave the area in the Cadillac as the other two males exited the gas station in the Black Lincoln Navigator and drove northwest on Bronxdale Avenue.  Minutes later, at approximately 9:27 p.m., Investigator Epidy observed the Black Lincoln pull into another gas station, a Mobile Gas Station, located at the intersection of Bronxdale Avenue and Bronx Park East in the Bronx.  Investigator Epidy observed Thaqi pumping gas in the Black Lincoln Navigator. Agents then followed the Lincoln Navigator back to Thaqi's residence at 1957 Bronxdale Avenue.  Minutes later, at approximately 9:33 p.m., agents observed the Lincoln Navigator leave Thaqi's residence at 1957 Bronxdale Avenue again driving northwest on

Bronxdale Avenue and saw that Thaqi and Karaqi were in the vehicle.  Agents followed

the black Lincoln Navigator to the area of Manhattan.

At approximately 10:12 p.m., the Lincoln Navigator stopped on the southbound

side of Broadway between West 95th Street and 94th Street, Manhattan, New York.  The

passenger of the Lincoln Navigator got out and walked northbound on Broadway.  At

approximately 10:22 p.m., DEA SA Kenneth Wasley observed a large, heavy set

unidentified male wearing black coat ("UM1," who as described below is believed to be

NICHOLAS ANTHIS, but could not be positively identified as ANTHIS), walk up to the

rear passenger side of the Lincoln Navigator.  Agent Wasley then observed UM1 take a

large weighted black bag out of the back of the Lincoln Navigator, walk south on

Broadway, and stop at a black BMW, bearing Quebec License Plate Number FAK9810.[1]

Around the same time, SA Popolow also observed the heavy set UM1 walk up to the

black BMW with Quebec License Plates and place the large weighted black duffel in the

vehicle.  Thereafter, at approximately 10:25 p.m., Senior Investigator Pizarro observed

the black BMW drive southbound on Broadway and make a right turn onto West 93rd

Street.

At around 10:30 p.m., NYSP Investigators Terrence Worthy and Epidy

conducted a vehicle stop of the black BMW on the corner of 93rd Street

---

[1]This vehicle, a 1997 Black BMW 740IA, was owned by Garage Magnum Inc.,
2880 CH Bates, Montreal, Canada.  Based on an internet search, Garage Magnum Inc in
Montreal appears to be a automotive repair services business that also rents vehicles.

and Riverside Drive, in Manhattan, New York.  During the course of the traffic stop, agents identified the driver as Eleftherios Sardis and the sole passenger as NICOLAS ANTHIS.[2]  Law enforcement agents instructed both Sardis (the driver) and ANTHIS (the passenger) to exit the vehicle for officer safety, and then asked both Sardis and ANTHIS for consent to search the vehicle.  Both Sardis and ANTHIS orally gave the agents consent to search the vehicle.  Shortly after the search began, Senior Investigator Ernesto Pizarro arrived at the scene and confirmed with both ANTHIS and Sardis that they had in fact consented to a search of the vehicle.

During the initial search of the vehicle, which took place while the black Mercedes was still parked on the corner of 93rd Street and Riverside Drive, NYSP Senior Investigator Pizarro found a red duffel bag in the backseat of the Mercedes.  The read duffle bag was already opened and in plain sight, without any manipulation of the bag, Senior Investigator Pizarro could see in plain sight that the bag contained a large amount of United States Currency.  Senior investigator Pizarro also found a black duffel bag, believed to be the same black duffel bag transferred from black Lincoln Navigator to the black BMW.  Agents then conducted a further investigation of these two bags and found that both the black and the red duffle bag contained a large sum of U.S. currency, and that the currency was wrapped in a manner consistent with how drug proceeds are typically

---

[2]It should be noted that was a ANTHIS was a large heavy set male that was wearing a black jacket, similar to UM1, but because of the night time darkness neither SA Popolow nor SA Wasley could positively identify him as UM1.  In contrast, Sardis was a taller, thinner male.

packaged - the money was bundled with rubber bands, with no bank wrappers, and were wrapped further in plastic shopping bags.

After the discovery of the money, ANTHIS said that the money found was his and stated that he was in the business of importing and exporting shrimp.  When asked by agents, ANTHIS said that he did not have receipts for the money.   ANTHIS also said that Sardis, the driver of the vehicle, was his uncle, and that Sardis was along for the ride.

After the discovery of this money, agents arrested both ANTHIS and Sardis and transported them and the black BMW back to the offices of the DEA in New York. While at the offices of the DEA, agents asked ANTHIS and Sardis for consent to search the black BMW.  In the presence of both SA Wasley and SA Popolow, both ANTHIS and Sardis signed a consent to search from and told agents that they could search the vehicle and have a dog go over it because there were no drugs in it.  Thereafter, NYSP Trooper Brian Will and his K9 drug dog "HUDSON" performed a dog search of the vehicle. "HUDSON" alerted positively for the presence of drugs to the vehicle, all four bags of money, and the empty suitcase.  During this second search, in the trunk of the vehicle, Senior Investigator Pizarro found a blue/grey duffel bag and a large suitcase that were also found to contain a large sum of U.S. currency wrapped in a similar manner. The total amount of U.S. currency together in these three duffle bags and the one suitcase was later determined to be $1,271,394 in U.S. Currency.

## C.     Consensual Interview of ANTHIS in New York

Following this seizure of money, and the arrest of both ANTHIS and Sardis,

agents advised ANTHIS of his Miranda and he agreed to speak to investigators.  Contrary

to what ANTHIS had first told agents about the money being associated with fish and

shrimp, ANTHIS now claimed that the money was being used to buy gold.  ANTHIS

explained that he was an entrepreneur, that he had invested in several businesses, and said

that he was getting cash from investors to buy gold dust in Africa.  ANTHIS claimed that

he was having a gold smelting operation built in Dallas, Texas and said that he was going

to buy the gold dust to be smelted from Africa and that the African gold sellers only take

cash.  ANTHIS also said that he owned a restaurant and moved large amounts of money

around the world through Swiss banks.  ANTHIS also stated that he picked up other

amounts of money, including up between $250,000 and $300,000 on January 17, 2011.

When agents asked ANTHIS where his offices were located, ANTHIS stated that he met

his investors on street corners and they gave him bags of money like the ones the agents

found on him.


**D.      October 22, 2010, Seizure of $497,955 from NICHOLAS ANTHIS**

On October 22, 2010, two days after the interview of ANTHIS and KAPERONIS

in Massachusetts about the October 5, 2010 seizure of U.S. currency in Massachusetts,

DEA agents in Ontario, California seized $497,955 from ANTHIS.  The seizure of

currency took place outside an hotel in Ontario, California.  Prior to the seizure, the same

10

day on October 22, 2010, a confidential informant ("the CI") registered with the Beverly Hills Police Department ("BHPD") provided specific information to the BHPD about a delivery of drug money that was going to be delivered to a money courier for a drug organization in Canada.  The BHPD in turn provided this information to the DEA in Los Angeles.

Based on this information, that same day, at approximately 12:00 p.m., DEA Special Agents and Berverly Hills Police Department ("BHPD") Detectives set up surveillance at the Ayres Inn & Suites 4395 E. Ontario Mills Parkway, Ontario, California.  At approximately 12:55 p.m., SA Shawn Breault observed a white male wearing a blue sport coat who was later identified as NICOLAS ANTHIS on the north side of the hotel near a grey Mazda sedan.   DEA Group Supervisor ("GS") Ted Salamy then observed a Hispanic male, later identified as Felipe Espinoza, driving a grey Ford sedan park next to the Mazda. Group Supervisor Salamy observed ANTHIS retrieve a weighted black duffel bag from the rear of the Mazda and hand the bag to Espinoza who then placed the black duffel bag in the rear of the Ford.  Group Supervisor Salamy then observed ANTHIS retrieve a light green duffel bag out of the trunk of the Ford and then walk inside the hotel.   ANTHIS and Espinoza engaged in minimal conversation during this transaction.

Over the course of approximately the next hour, agents observed ANTHIS walk in and out of the hotel talking on a cellular telephone.  At approximately 2:02 p.m., SA Breault again spotted ANTHIS on the north side of the hotel with the light green duffel

bag on the ground next to him.  At this time, in coordination with the DEA investigation,

several uniformed Ontario Police Department ("OPD") officers approached ANTHIS.

Upon being approached by the officers, ANTHIS walked away from the officers and

spontaneously stated, "It's my money."  At this point, officers detained ANTHIS.  While

being questioned by OPD Officers, ANTHIS gave the officers oral consent to search the

light green duffle bag, as well as the Mazda and his hotel room.  During a search of the

light green duffle bag, officers discovered the bag was filled with a large amount of

U.S. currency in a manner consistent with the bulk smuggling of narcotics proceeds.

Some of the cash was vacuum sealed in plastic bags and some of stacks of U.S. currency

were wrapped in rubber bands.  Following the discovery of the money, a trained and

certified OPD narcotics detection dog alerted to the money for the presence of narcotics.

The total amount of money found in the green duffle bag was later determined to be

$497,955 in U.S. currency.


**E.      Consensual Interview of ANTHIS in Ontario, California**

Following this seizure, agents advised ANTHIS of Miranda warnings.  ANTHIS

agreed to be interviewed by law enforcement agents.  When asked why he was in the

possession of so much U.S. currency, ANTHIS explained to DEA TFO Jesse Perez that

he was the Vice President of *Ghandian Trading LLC*, that the president of the company

was ILLIAS KAPERONIS, and that the money was for the purchase of gold.  Contrary to

the observations that agents made (of ANTHIS receiving the money from Espinoza),

ANTHIS claimed that he had received the money from KAPERONIS in White Plains, New York and who instructed ANTHIS to purchase 7 bars of gold and diamonds with the money. ANTHIS said that KAPERONIS told him that there was $500,000 in the green duffle bag. ANTHIS explained that the he and KAPERONIS flew with the money on a privately chartered jet from White Plains, New York to Las Vegas, Nevada, where ANTHIS picked up his girlfriend, Yara Sanner, and drove with the money to Ontario. ANTHIS said he dropped off KAPERONIS at the Monte Carlo hotel in Las Vegas.

When asked about the black duffle bag that he handed to Espinoza,  ANTHIS claimed that the bag contained $20,000 and paperwork related to *Ghandian Trading*. ANTHIS identified Espinoza only as "Sam" and said that he did not know his last name. When asked if he called "Sam" to arrange the meeting, ANTHIS replied, "No, of course not. Joe sent me because he knew I was there." When TFO Perez asked for "Joe's" last name, ANTHIS replied, "I can't tell you that. The government can't have any of my partner's information!" ANTHIS claimed that "Sam" (Espinoza) was a driver for "Joe."

ANTHIS was also found in the possession of a Blackberry and a T-Mobile prepaid phone that ANTHIS said he bought in White Plains. ANTHIS also gave agents consent to search his hotel room which revealed several "pay-and-owe" sheets with the names "Charlie" and "Steve" written on them. ANTHIS claimed that these individuals were investors. ANTHIS said that he had no documentation for the money seized by that KAPERONIS could provide such documentation at a later time.

## II.  ARGUMENT

**A.      ANTHIS Has Not Demonstrated a Reasonable Expectation of Privacy in the black BMW Rental Vehicle Searched in New York City on January 17, 2010.**

As an initial matter, the Court should deny ANTHIS's motion to suppress the January 17, 2010, seizure of cash in New York because ANTHIS has not demonstrated a reasonable expectation of privacy in the vehicle or bags that were searched.  Instead, ANTHIS has only shown that he was a passenger in the black BMW that the police searched.

To seek suppression of evidence based on a Fourth Amendment violation, a defendant must show that his own Fourth Amendment rights were violated.  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see United States v. Payner*, 447 U.S. 727, 731 (1980) ("the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party") (emphasis in original). "The Fourth Amendment's protection against unreasonable searches and seizures extends only to those places and interests in which the defendant has a reasonable expectation of privacy."  *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994); *United States v. Cruz Jiménez,* 894 F.2d 1, 5 (1st Cir.1990).  And it is "well settled that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have 'standing' to claim that an illegal search or seizure occurred." *United States v. Mancini,* 8 F.3d 104, 107 (1st Cir.1993)(citing *Rakas v. Illinois,* 439 U.S. 128, 138-48(1978)).

14

Showing such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis.  *See Cruz Jiménez,* 894 F.2d at 5 (citing *United States v. Salvucci,* 448 U.S. 83, 90-91 (1980)). A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects cannot contest their search or seizure. *United States v. Sanchez,* 943 F.2d 110, 113 (1st Cir.1991); *United States v. Gomez,* 770 F.2d 251, 253 (1st Cir.1985)(This burden must be carried at the time of the pretrial hearing and on the record compiled at that hearing). "[A] failure to present evidence with respect to such an expectation of privacy prevents a defendant from making a claim for suppression under the Fourth Amendment." *United States v. Samboy,* 433 F.3d 154, 162 (1st Cir. 2005).

"In order to make such a showing, [the defendant] must show that he had both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008). Factors relevant to the standing determination include "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case."  *Sanchez*, 943 F.2d at 113.

Nevertheless, as the First Circuit has recently made clear, a passenger of a motor vehicle does not have a reasonable expectation privacy to contest the search of that vehicle:

In the context of a vehicle search, a passenger who has 'asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized,' has made no showing that he or she has a legitimate expectation of privacy in, for example, the area under the seat of the car in which he or she was 'merely [a] passenger [ ].' [Citing *Rakas* at 148]. Under such circumstances, a vehicle search does not infringe upon the passenger's Fourth Amendment rights. Thus, the passenger lacks standing to challenge the search.

*United States v. Symonevich*, 688 F.3d 12, (1st Cir. 2012).[3]

Here, in the affidavit that ANTHIS submitted in support of his motion to suppress, ANTHIS has claimed that the vehicle that was searched, a black BMW, bearing Quebec License Plate Number FAK9810, was "his vehicle." However, based on the license plate on the BMW, this vehicle, a black 1997 BMW 740IA, is not registered to ANTHIS and instead comes back to Garage Magnum Inc., an automotive repair services business in Montreal that also rents vehicles. ANTHIS has not made any showing that he rented this vehicle or has any ownership interest in the vehicle. Without such a showing, ANTHIS has only been shown to be a passenger in the vehicle, and as such, does not have standing under the Fourth Amendment to challenge the search of the vehicle.

---

[3]*See also Rakas*, 439 U.S. at 140-149 (passengers in car which they neither owned nor leased lacked a reasonable expectation of privacy in the glove compartment and area under the seat); *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) (passenger "with no possessory interest in the car" "has no reasonable expectation of privacy * * * that would permit [his] Fourth Amendment challenge to a search of the car") (internal quotation marks omitted); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) ("A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns or rents it.") (dictum).   .

**B.      ANTHIS Gave Voluntary, Intelligent, and Knowing Consent to Law Enforcement Agents**

The Court should deny ANTHIS's motion to suppress because the consent to search that ANTHIS gave was knowing, intelligent, and voluntary.   Under well settled Fourth Amendment jurisprudence, the police may conduct a search without a warrant or probable cause based upon an individual's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  A "specifically established exception[ ]" to the Fourth Amendment's "requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Vilches–Navarrete,* 523 F.3d 1, 15 (1st Cir.2008) (quoting *Schneckloth v. Bustamonte,* 412 U.S. at 219)(internal quotation marks omitted); *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999); *United States v. Barnett*, 989 F.2d 546, 554 (1st Cir. 1993).

Nevertheless, for consent to be valid, it must be given knowingly, intelligently, and voluntarily.  *See United States v. Marshall,* 348 F.3d 281, 286 (1st Cir. 2003).  "The Fourth Amendment test for a valid consent search is that the consent be voluntary," "a question of fact to be determined from all the circumstances.' " *Ohio v. Robinette*, 519 U.S. at 33, 39 (1996)(quoting *Schneckloth v. Bustamonte*, 412 U.S. at 248-49); *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004). Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. *United States v. Perez-Montanez,* 202 F.3d 434, 438 (1st Cir.2000).

In evaluating the voluntariness of consent, "the focus is often on whether the individual's will has been overborne and his capacity for self-determination critically impaired." *United States v. Brake*, 666 F.3d 800, 806 (1st Cir. 2011)(internal citations omitted). "Determining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances, rather than on a mechanical application of legal factors to a factual scenario." *Id.* Whether consent was voluntary must be determined based on the totality of the circumstances including the individual's knowledge of his or her right to refuse; the age, education, intelligence and language skills of the individual; degree of cooperation with the police; the individual's attitude regarding the likelihood of discovery of contraband; the length of detention; and the nature of police questioning. *See Schneckloth v. Bustamonte* at 412 U.S. at 226; *Perez-Montanez*, 202 F.3d at 438; *Marshall*, 348 F.3d at 286; *United States v. Twomey*, 884 F.2d 46, 51 (1st Cir. 1989). "Written consent is not essential to the establishment of a valid consensual search." *Barnett,* 989 F.2d at 555 (1st Cir.1993).

### 1.     January 17, 2010 Seizure in New York

ANTHIS does not dispute the fact that he gave oral consent to search the black BMW. Instead, ANTHIS argues that the verbal consent he gave to law enforcement agents was "not the product of rational thought and contemplation, but instead, coercion." Anthis Motion at 3. In his Affidavit, ANTHIS also alleges that he consented to the search

because he felt he was not free to leave and that the police "were going to search anyway." *See* Anthis Affidavit (Doc 237-1) at page 1.  ANTHIS's motion has not merit and should be denied.

First, under the totality of the circumstances in this case, it is clear that ANTHIS's consent was not the product of coercion.  Instead, ANTHIS choose to cooperate with the police and pursued a strategy of cooperation and deceit, first claiming to the New York State Police that the more than $1 million in cash was the proceeds of a fishing business, and then changing stories, and informing federal agents that the money was part of a cash for gold business venture.  *See Brake*, 666 F.3d at 806 (the defendant "chose to cooperate with the police of his own free will throughout the encounter, having decided to pursue a "'strategy of cooperation and ignorance'").  Significantly, this same cash for gold business venture story was the same approach that ANTHIS employed with federal agents in Massachusetts on October 20, 2010, and then again in Ontario, California on October 22, 2010.

Second, in contrast to the cases that have found a coerced compliance, here there has been no showing that the New York State Police officers making the vehicle stop made any assertions to ANTHIS or Sardis that could be characterized as threats or coercion.  Instead, ANTHIS points to the coercive atmosphere of the vehicle stop, numerous police officers with guns drawn ordering him and Sardis out of the vehicle. However, even if ANTHIS was in custody at the time he and Sardis gave oral consent to

search the vehicle, the case law makes clear that consent may still be voluntary even if that person does not feel free to leave.  *See Florida v. Bostick,* 501 U.S. 429, 435–36 (1991); *see also United States v. Jones,* 523 F.3d 31, 38 (1st Cir.2008) (noting that while the possibility of coercion may be heightened if the person is in custody at the time consent is obtained, "custody alone has never been enough in itself to demonstrate coerced consent to search" (internal quotation marks and ellipsis omitted)).  Consent can also be voluntary even when the police make a substantial show of force.  *See e.g., United States v. Chaney,* 647 F.3d 401 (1st Cir.), *cert. denied*, 130 S.Ct. 1557 (2011)(Consent voluntary despite overwhelming show of force, where the police officers drew weapons and handcuffed all the occupants of a motel room, because the excitement of the initial entry had passed); *Jones*, 523 F.3d at 38 (The fact that ten to fifteen officers entered hotel room with guns drawn insufficient to void voluntariness of consent).

### 2.      The October 22, 2010 Seizure in Ontario, California

The October 22, 2010 seizure of $497,955 from the green duffle bag that ANTHIS had in his possession in front of the hotel in Ontario, California is a more straightforward factual dispute.  ANTHIS claims there was no consent.  The government anticipates that it will present testimony that when Ontario Police Department officers began to approach ANTHIS in a public place in front of the hotel, before the discovery of any money, ANTHIS spontaneously stated, "It's my money."  The government also anticipates that it

will present testimony that ANTHIS then gave oral consent to the Ontario Police Officers to search the bag and oral consent to the DEA to search his hotel room.

What the Court should consider here is ANTHIS's prior interactions with the police and federal law enforcement agents on January 17, 2010 and two days before on October 20, 2010 in Massachusetts.  On each occasion, ANTHIS did not shy away from U.S. law enforcement agents, but instead voluntarily engaged them in an effort to convince them that the millions of U.S. dollars in cash he was transferring was being used to purchase gold, and was not the proceeds of drug sales.  The October 20, 2010, interview in Massachusetts was a consensual interview that took place at the offices of a local attorney.

Therefore, while the government agrees that a evidentiary hearing is required because of the fact specific nature of the issue, the government asserts that the under the totality of the circumstances that the Court is obligated to consider, the consent that ANTHIS gave was free and voluntary.

**C.     There Was Probable Cause to Search**

In addition to valid consent, prior to the search of the black BMW in New York City on January 17, 2010, and the search of the bag that ANTHIS received on October 22, 2010 in Ontario, California, law enforcement agents had probable cause to search.  This probable cause was based on specific information provided by reliable government

informants that was corroborated by law enforcement surveillance observations that quickly verified the accuracy of the informants' information.

"Probable cause" to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). It is a fluid concept that turns on the assessment of probabilities in particular factual concepts. Id. at 232.  For this reason, "the evidence thus collected must been seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 231-32.

The case law also makes clear that to establish probable cause, the government "need not present the quantum of proof necessary to convict." *United States v. Torres-Maldonado*, 14 F.3d 95, 105 (1st Cir. 1994)(quoting *Uricoechea-Casallas,* 946 F.2d at 165). *See also United States v. Morris,* 977 F.2d 677, 684 (1st Cir.1992) (same); *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987)(same). "Rather, it need only show that at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *United States v. Martinez-Molina*, 64 F.3d 719, 726 (1st Cir. 1995); *Torres-Maldonado,* 14 F.3d at 105. In assessing probable cause, the court must look at the "totality of the circumstances."  *Gates,* 462 U.S. at 238; *United States v. Link*, 238 F.3d 106, 109 (1st Cir. 2001).

**1.     January 17, 2010 Seizure in New York**

The January 17, 2010, vehicle stop of ANTHIS and Sardis was not the result of a random traffic stop.  Instead, that same day, federal agents had received specific information that the main target of their investigation, Gjavit Thaqi, a.k.a. "Doc," was going to deliver $250,000 in drug proceeds to an organization in Canada. This informant was proven reliable and in December 2009 had provided information that led to the seizure of marijuana at a warehouse in Brooklyn.  The agents then conducted surveillance, followed Thaqi and another target of the investigation, Robert Karaqi, as they drove in a Lincoln Navigator from the Bronx to Manhattan, and observed a male, believed to be ANTHIS, take possession of a large black duffle bag from Thaqi and Karaqi and place the bag into a black BMW with Quebec License plates.

At this point, contrary to ANTHIS's assertions, there was probable cause to believe that the occupants of the black BMW were the individuals taking possession of drug money and that the black BMW contained evidence of a crime, namely conspiracy to distribute controlled substances and money laundering, and contraband, that is, drug money.  *See United States v. Watson*, 423 U.S. 411, 418, 422 n.11 (1996); *Carroll v. United States*, 267 U.S. 132, 156, 161-62 (1925)(warrantless arrest lawful because police stopped car and arrested occupants upon probable cause that occupants had committed a felony).

Furthermore, while probable cause is required for a search or seizure, under *Terry v. Ohio*, law enforcement officers may lawfully initiate an investigatory detention, a brief

seizure by the police, if they have reasonable, articulable suspicion that a person is engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 21 (1968)(an investigatory detention is valid if the police state "specific and articuable facts which, taken together with rational inferences from those facts" justify intrusion). Thus, even if there was not probable cause to stop and question ANTHIS and Sardis, there was clearly reasonable suspicion that justified law enforcement agents stopping the black BMW with Quebec license plates.

### 2.    The October 22, 2010 Seizure in Ontario, California

The October 22, 2010 seizure was also not the work of random police surveillance. Instead, the Beverly Hills Police Department and the DEA received specific information about a delivery of drug money in Ontario, California. That information, led agents to a particular hotel in Ontario where agents observed ANTHIS meet with a Hispanic male in the hotel parking lot and exchange bags with little or no conversation. Ontario Police Department officers then approached ANTHIS, and when they did ANTHIS started to walk away and, on his own, and before any money was found, said the money belonged to him. Under the totality circumstances, these facts, when put together with the specific information that an informant provided that led them to ANTHIS, demonstrates that law enforcement agents had more than sufficient probable cause to stop and arrest ANTHIS for violations of federal law. At the very least, there was also reasonable suspicion under *Terry v. Ohio*.

**D.      The Statements that ANTHIS Gave Were Voluntary and Were Made After Agents Advised ANTHIS of his Miranda Warnings**

Finally, contrary to defendant's assertions, the government anticipates showing at any hearing in this matter that following ANTHIS arrest on January 17, 2010, and October 22, 2010, federal law enforcement agents advised ANTHIS of his Miranda warnings and that ANTHIS voluntarily gave statements to the agents about the money that was seized from him.

### III.  CONCLUSION

Accordingly, although the government agrees that the defendant is entitled to an evidentiary hearing, the government submits that after that hearing, the Court should deny defendant's motion to suppress in its entirety.

Respectfully submitted,
CARMEN M. ORTIZ
United States Attorney

By:                /s/ Neil Gallagher
Neil J. Gallagher, Jr.
Assistant U.S. Attorney

Date: September 11, 2012

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Neil J. Gallagher, Jr.
Neil J. Gallagher, Jr.