UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL NO. 11-10195-RWZ

UNITED STATES OF AMERICA

v.

NICOLAS ANTHIS

MEMORANDUM OF DECISION

January 3, 2013

ZOBEL, D.J.

Defendant Nicolas Anthis has been charged in a superseding indictment with making material false statements to federal investigators and conspiracy to commit money laundering. He now moves to suppress evidence obtained by the government on two occasions: a vehicle stop on January 17, 2010 in New York City, and an individual stop on October 22, 2010 in Ontario, California. After holding an evidentiary hearing and considering defendant's affidavits, I find the following facts and deny defendant's motion.

**I.  Findings of Fact**

Defendant claims his constitutional rights were violated by law enforcement in two different encounters. I give the facts of each encounter separately.

**A.  January 17, 2010**

In 2009, a joint task force including investigators from Immigration and Customs

Enforcement ("ICE"), the Drug Enforcement Administration ("DEA"), and the New York State Police ("NYSP") began receiving information from a confidential informant about an individual named Gjavit Thaqi. The informant told task force agents that Thaqi was trafficking drugs in New York City, and provided information that allowed the government to seize a substantial amount of marijuana from a warehouse in Brooklyn in December 2009.

On the morning of January 17, 2010, the same informant told the task force that a man named Nicholas Masi, another target of the investigation, would take $250,000 from Long Island to the Bronx that afternoon to give to Thaqi. The informant explained that Thaqi would deliver the money to certain French Canadians as payment for a marijuana shipment. Based on that information, task force agents set up surveillance on Bronxdale Avenue in the Bronx near Thaqi's residence. Shortly after 9pm, surveillance officers observed Masi driving a dark grey Cadillac in the area. The officers watched Masi pull into a well-lit Getty gas station and park next to a dark Lincoln Navigator. In the Navigator were Thaqi and a man named Robert Karaqi, who owned the Navigator and was also a target of the investigation. The officers saw Masi take a red duffel bag out of his Cadillac and give it to one of the men in the Navigator. The Cadillac and the Navigator then drove off in different directions.

The investigating officers continued to follow the Navigator, which stopped at a different gas station to get gas and then stopped briefly at Thaqi's residence. The Navigator next headed southwest into Manhattan, where it parked on Broadway around 95th Street at about 11pm. The surveillance team then saw a tall, heavyset man

2

wearing a dark coat come up to the Navigator, lean into the vehicle, and come out with a duffel bag. The officers were not able to identify the heavyset man at that point or see the color of the bag, because it was dark out and the streetlights were too dim to show details. The heavyset man then carried the bag to a black BMW with Quebec license plates parked further down Broadway. He got in with the bag and the BMW drove off.

At that point, the surveillance team decided to stop the black BMW. Two NYSP officers on the team stopped the vehicle on 93rd Street between Broadway and Riverside Drive; they were joined shortly thereafter by NYSP senior investigator Ernesto Pizarro. When Pizarro arrived, the two NYSP officers who performed the stop were standing on each side of the car, one outside the driver door and one outside the front passenger door. The BMW's two occupants, subsequently identified as a man named Eleftherios Sardis (who was driving) and defendant, were still in the car. Defendant is a tall, heavyset man and was wearing a dark coat when the car was stopped.

Pizarro approached the car and told the two officers to take the occupants out of the vehicle. The officers opened the doors and guided the occupants over to stand by the passenger side of the car. Pizarro testified that the officers did not draw their weapons at any point, and neither defendant nor Sardis were restrained by handcuffs or "flexicuffs" (plastic zip-tie handcuffs).

As Pizarro approached the car, he saw a red duffel bag inside (along with several other suitcases). He testified that the red duffel bag was partially open, and that he was able to see currency bundled in plastic inside.

Pizarro then turned to Sardis and defendant and asked, "Do you mind if I look in your car?" Defendant responded, "No, go ahead." Pizarro opened the rear passenger door and looked inside the suitcases in the passenger compartment. The red duffel and another bag each contained large sums of U.S. currency wrapped in plastic, while a third bag was empty. There were also two more bags in the trunk of the car that contained more money wrapped in a similar fashion. It was later determined that the total amount of money in the car was more than $1.2 million.

Throughout Pizarro's search of the car, defendant was able to see what Pizarro was doing. Defendant never told Pizarro to stop or sought to withdraw his consent.

Meanwhile, several other federal and state officers arrived at the scene. After the money was discovered, one agent asked defendant where the large sums came from. Defendant responded that he was in the seafood import/export business, but did not provide further details. Defendant was not under physical restraints at that point, nor had any officers drawn their weapons.

Defendant and Sardis were then taken into custody and handcuffed before being transported to the DEA station in New York for further questioning. The BMW was also taken to the station, driven by Pizarro. The entire interaction at the scene of the stop, before defendant and Sardis were taken to the station, took about fifteen minutes.

Once back at the station, defendant was given his <u>Miranda</u> warnings and he agreed to speak to the agents. He told them that the money came from investors in his gold-smelting business, and would be used to buy gold for smelting. He refused, however, to give the names of any of his investors. He explained his previous seafood

4

story by saying that he had a few different businesses. The agents present testified that the interview was friendly, and that defendant remained calm and cooperative.

Defendant and Sardis also each signed written consent forms at the DEA station specifically permitting DEA agents to search the BMW. The BMW was not owned by defendant or Sardis; it was a rental car. No evidence was presented to show who was renting the car at the time of the stop. The one agent who testified could not recall whose name was on the rental agreement.

The BMW was searched more thoroughly at the station, and was tested for narcotics by a trained police dog. The dog alerted positively for the presence of narcotics in the currency found inside the car.

Defendant and Sardis were released without being charged, but the task force kept possession of the money pending further investigation.

I note that defendant has submitted an affidavit describing very different events. He claims that he was stopped by officers with their weapons drawn, that he and Sardis were immediately restrained by flexicuffs around their wrists, and that none of the bags in the BMW were open until after the police began searching them. He admits that he consented to the search of the car, but claims he only consented because he "felt that [he] was not free to leave, and they were going to search anyway." Docket # 290, ¶ 6. He likewise claims his signature on the written consent form and his statements at the DEA station were not voluntary. Given all the evidence presented, including the fact that defendant testified only by affidavit, I find his story lacks credibility.

**B.    October 22, 2010**

5

The second incident that defendant challenges took place in California, in the city of Ontario (near Los Angeles). On the morning of October 22, 2010, DEA agent Jesse Perez received a call from a confidential informant. That informant had previously provided reliable information that led to the seizure of $2 million and forty kilograms of cocaine in an earlier operation. The informant stated that an unspecified individual would be delivering drug money to a confederate that morning at an Ayres Hotel in Ontario. The DEA then set up surveillance of the hotel indicated. DEA agent Shawn Breault observed defendant standing outside of the hotel, apparently waiting for someone; Breault testified that no one else was waiting there at the time. Breault then saw a grey Ford sedan drive into the hotel parking lot, and watched defendant take a dark duffel bag out of a nearby grey Mazda and put it in the back seat of the sedan. Defendant then walked back towards the hotel, again carrying a dark duffel bag. Breault could not tell if this was the same bag or a different one. Defendant remained outside the hotel with the bag for about an hour after the Ford left, walking back and forth and talking from time to time on his mobile phone.

At that point, the DEA surveillance team contacted Ontario police officers to stop defendant for questioning. Ontario police officer Brant Devey arrived at the Ayres Hotel in uniform, driving his marked police cruiser. As Devey entered the parking lot and made eye contact with defendant, defendant turned and began moving quickly around the corner of the building, still carrying his duffel. Devey parked and ran to catch up with defendant, stopping him outside a back entrance to the hotel. At that point, defendant had the duffel bag in one hand and the other hand in his pocket. Devey told

6

defendant to remove his hand from his pocket; when defendant did not immediately comply, Devey grabbed defendant's hand and removed it from his pocket. Devey testified that when he grabbed defendant's hand, defendant responded by saying "It's my money!" Devey then instructed defendant to drop the bag, which defendant did. Devey led defendant over to his patrol car and had him sit on the bumper. He asked defendant what was in the bag, and defendant informed him that the bag held money. Devey asked defendant if he could look in the bag, and defendant gave him permission. Devey looked and found about $500,000 in U.S. currency inside. Devey then asked defendant where the money was from, and defendant said that he bought and sold gold.

Other Ontario police officers and DEA agents then arrived on the scene, including DEA agent Perez. Perez also spoke with defendant and asked him why he was carrying so much currency; defendant repeated that he bought and sold gold. Perez also testified that while he was talking to defendant, another DEA agent named Johnson approached and asked defendant for consent to search his hotel room, which defendant gave. Defendant was apparently never placed under restraints, nor did any of the officers at the scene draw their weapons.

Defendant was subsequently released without being charged. The currency was seized by the DEA for further investigation.

Again, this version of the facts differs from defendant's affidavit. Defendant states that he never consented to the search of either his bag or his hotel room, and that any statements he made to agent Perez were involuntary. Here as above, given all

the evidence presented and the fact that defendant testified only by affidavit, I find defendant's story lacks credibility.

## II. Analysis

The evidence presented shows no constitutional violation warranting suppression at either encounter.

### A. January 17, 2010

Defendant moves to suppress the evidence found in the January 17, 2010 search of the BMW, the statements he made at the time of the search, and his later statements at the DEA station.

#### 1. Vehicle Search

Defendant argues that the police violated his Fourth Amendment rights by searching the black BMW without a warrant. This argument fails for several reasons.

First, defendant has not shown that he has standing, as that term is used in suppression cases, to challenge the vehicle search. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978). To do so, the party seeking suppression must show that he personally had a reasonable expectation of privacy in the place searched. United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012). A passenger in a car generally does not have a reasonable expectation of privacy against searches of that car if he "assert[s] neither a property nor a possessory interest in the automobile, nor an interest in the property seized." Rakas v. Illinois, 439 U.S. 128, 148 (1978); see also Symonevich, 688 F.3d at

8

19-21. Here, defendant states in conclusory fashion in his affidavit that the car was "in [his] custody" and the bags in the car were "in [his] possession and custody." Those statements fail to demonstrate either a property or a possessory interest in the automobile, given that the car belonged to a rental company and that defendant failed to show he was then renting it. As for defendant's interest in the bags, the First Circuit has recently made clear that a possessory interest alone is not enough to establish a reasonable expectation of privacy in property placed in another person's automobile. Symonevich, 688 F.3d at 21. Because defendant has not shown his standing to challenge the search, his suppression motion must be denied.

Furthermore, even if defendant had standing, he consented to the search. A search authorized by voluntary consent does not violate the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Brake; 666 F.3d 800, 806 (1st Cir. 2011). Defendant concedes that he consented to the search; however, he argues that his consent was not voluntary. Whether consent to search was voluntary "is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. Defendant's argument that his consent was involuntary depends heavily on his own version of the relevant facts; according to his affidavit, federal agents ordered him out of the vehicle at gunpoint and then restrained him with zip ties before asking his consent to search the car. However, I find defendant's affidavit less credible than the testimony of the officers at the evidentiary hearing. Based on the officers' testimony, I find—as described above—that no officer drew his weapon at the scene, and that defendant was not restrained when he gave

9

consent to the search. Instead, the officers merely stopped the car, told the occupants to exit and guided them over to stand by the passenger side, and then asked for their consent to a search. Those events raise no inference of coercion. On the facts described, I find that defendant's consent to the vehicle search was voluntary. Cf. Brake, 666 F.3d at 806 (finding consent voluntary although given immediately after a Terry stop-and-frisk).

This conclusion is particularly plausible given the evidence that defendant voluntarily cooperated with law enforcement on two later occasions, a consensual meeting on October 20, 2010 and the encounter on October 22, 2010. On those occasions, defendant consistently admitted that he was involved with large sums of cash but sought to convince officers that the cash came from a legitimate gold trading business. Defendant apparently engaged in the same strategy at this encounter—allowing officers to discover the money, but claiming its source was legitimate.

Defendant also argues that his consent to search the vehicle did not include consent to open the bags in the car. Where a defendant consents to a search, the scope of his consent his measured by an objective reasonableness standard. Florida v. Jimeno, 500 U.S. 248, 251 (1991). In other words, the question is how far a reasonable person would have believed the defendant's consent extended. Id. In this case, defendant gave Pizarro permission to look in his car. It was objectively reasonable for Pizarro to believe that permission extended to looking inside the suitcases in the car, particularly since one of the bags was already partially open. Cf. id. at 251-52; United

States v. Stierhoff, 549 F.3d 19, 24 (1st Cir. 2008) (noting that a general consent to search subsumes consent to search any easily accessible containers in the designated area). Furthermore, defendant was able to watch what officer Pizarro was doing throughout and never objected. That fact reinforces that it was objectively reasonable to believe that defendant's consent extended to looking inside the unlocked bags. Cf. Stierhoff, 549 F.3d at 24.

Finally, the warrantless search was lawful under the motor vehicle exception. Though the Fourth Amendment generally forbids the government from conducting searches without a warrant, it allows warrantless searches of motor vehicles and their contents upon probable cause. California v. Acevedo, 500 U.S 565 (1991); Carroll v. United States, 267 U.S. 132 (1925); United States v. Goncalves, 642 F.3d 245, 249 (1st Cir. 2011). That rule is premised on the relative mobility of motor vehicles and the lesser expectation of privacy therein. See California v. Carney, 471 U.S. 386, 390-93 (1985).

Probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Here, the government initiated its surveillance based on statements by an informant who had proven reliable in the past. The informant told them that Masi would transfer a large sum of drug-related money that afternoon to Thaqi, who would then transfer it to French Canadians representing a drug-trafficking organization in Canada. The investigators' observations corroborated the informant's statements; they watched Masi hand over a duffel bag to Thaqi and Karaqi, then watched another individual transfer a

duffel from Karaqi's car to a BMW with Quebec plates. And when Pizarro approached the BMW, he observed currency wrapped in plastic inside the partially-open red duffel bag. Those observations, combined with the informant's statements, gave the agents probable cause to believe they would find evidence of drug trafficking in the BMW. Given that probable cause, it was no violation of the Fourth Amendment for them to search the contents of the car.[1]

### 2. Statements at the Scene

Defendant next argues for suppression of his statements at the scene that the money came from his seafood business. He first contends that the statements are suppressible as fruits of the poisonous tree, tainted by the illegal stop and search of the BMW. See Wong Sun v. United States, 371 U.S. 471 (1963). Because the stop and search of the BMW was not illegal, however, this argument fails. Second, defendant points out that he was not given Miranda warnings before the officers questioned him at the scene. But as he was not in custody at that point—he was not under restraints, and had been detained at the side of the road for less than fifteen minutes—no Miranda warnings were required. See Berkemer v. McCarty, 468 U.S. 420, 435-42 (detention during typical traffic stop is not custody for Miranda purposes).

### 3. Statements at the DEA Station

---

[1] The initial stop of the BMW, as distinguished from the subsequent search, was also clearly lawful. A brief investigatory stop of an automobile requires only reasonable suspicion. United States v. Brignoni-Ponce, 422 U.S. 873 (1975); see Terry v. Ohio, 392 U.S. 1 (1968). The government agents here clearly had a reasonable suspicion that the BMW was involved in illegal activity, based on the informant's statements and their own observations.

Defendant also seeks suppression of the statements he made at the DEA station after he was given his Miranda warnings. First, he argues that these statements are also fruits of the illegal stop and search, an argument that fails here as above. Second, he argues that his waiver of his Miranda rights was not made "voluntarily, knowingly and intelligently," as is constitutionally required. Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Whether a Miranda waiver is voluntary and knowing depends on the totality of the circumstances. Fare v. Michael C., 442 U.S. 707, 724 (1979). Here, the evidence presented shows that defendant's decision was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421. Defendant claims that the agents falsely informed him that he was not under arrest and would be allowed to leave with his vehicle and perhaps his money if he cooperated. He also states that he was not given the opportunity to make a telephone call. But considered in their totality, the circumstances show that defendant's waiver was fully knowing and voluntary. Defendant is apparently a sophisticated businessman. The allegedly misleading statements by the government agents were brief and not heavily emphasized. There is no evidence that defendant relied on those statements in deciding to waive his rights. According to the officers present, the interview at the station was calm and friendly. There was no hint of any improper physical or psychological pressure on defendant to give up his rights. Finally, defendant's decision to waive his rights accords with his apparent strategy of cooperating with the police while providing them false information. Based on the evidence as a whole, I conclude that defendant's Miranda waiver was

made knowingly and voluntarily, and provides no basis for suppressing his statements at the DEA station.

### B. October 22, 2010

Regarding his October 22, 2010 encounter with the government in Ontario, California, defendant seeks suppression of the money found in the bag he was carrying, any evidence found in subsequent searches of his hotel room and automobile, and the statements he made to officers at the scene.

#### 1. Bag Search

Defendant first challenges the warrantless search of the duffel bag he was carrying when stopped by officer Devey outside the Ayres Hotel. Of course, the initial stop of defendant outside the hotel was clearly lawful. The confidential informant had stated that someone would be delivering drug money at the hotel that day, and that information was corroborated when the surveillance team watched defendant's interaction with the silver Ford. Furthermore, the defendant apparently attempted to avoid Devey when he arrived in his marked police cruiser. Those facts provided abundant reasonable suspicion to justify a brief investigation.

Regarding the bag search, Devey testified at the evidentiary hearing that after he stopped defendant, he asked what was in the duffel, and that defendant responded there was money inside. Devey testified that he then asked for permission to look inside the duffel, and that defendant gave him permission. Defendant contradicts that story in his affidavit, stating that several uniformed officers searched the duffel without his consent. Considering all the evidence presented, including Devey's demeanor while

14

testifying and the fact that defendant testified only by affidavit, I find that defendant did consent to the search of his bag. That conclusion is again reinforced by defendant's apparent strategy of engaging cooperatively with the police but giving them false information. Only two days before this seizure, defendant met voluntarily with federal agents regarding other money that the government had seized, and sought to convince those agents that the money came from a legitimate gold-trading business. That recent interaction with the government lends credence to the idea that defendant would quickly consent to the search of his bag and then rely on his gold-trading story to explain the money inside.

To the extent that defendant also challenges whether his consent was voluntary, the circumstances show that it was. Defendant presented as a sophisticated businessman, as noted above, and at this point he had experienced at least two previous encounters with law enforcement. He was not under restraints, nor was he threatened by drawn weapons or any other show of force. The investigation took place in a public parking lot in broad daylight and lasted perhaps fifteen minutes. In sum, nothing about the interview indicates duress or an unduly coercive atmosphere tainting defendant's consent.

### 2. Hotel Room Search

Defendant also states in his affidavit that he did not consent to the officers' search of his hotel room. At the evidentiary hearing, DEA agent Perez testified that he heard DEA agent Johnson ask defendant for permission to search his hotel room, and that defendant gave him permission. I find Perez's testimony credible, and conclude

that defendant consented to the search of his hotel room. I also conclude defendant's consent was voluntary. Defendant claims in his affidavit that any consent "was the product of unreasonable detention and coercion," and that he "was made to feel that [he] was not free to leave or not cooperate." Docket # 344, ¶ 7. The other evidence presented, however, refutes that contention. As discussed above, the entire investigative stop lasted about twenty minutes, and showed no sign of duress or coercion that could make defendant's consent involuntary.

### 3. Car Search

Defendant further claims that his car was searched at the hotel and seeks to suppress any evidence found in the car. The government indicated at the evidentiary hearing that it did not plan to present any evidence derived from any search of defendant's car at the hotel. Therefore, I need not consider this issue.

### 4. Statements

Finally, defendant seeks suppression of all statements he made to law enforcement officers at the scene. First, he claims that any such statements were fruits of the poisonous tree, tainted by the preceding stop and search. But as the stop and search were lawful, that argument fails. Second, he points out that he was never given Miranda warnings before the police questioned him. But defendant was not in custody; he was merely detained for a brief investigative stop, and not arrested or placed under physical restraint. Miranda warnings therefore were not required. See Berkemer, 468 U.S. at 440.

## III. Conclusion

Defendant's motion to suppress evidence (Docket # 237) is DENIED.

| January 3, 2013 | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |